UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION



JOSE J. AYALA, JR., AND JEFF
SANTOS, ON BEHALF OF THEMSELVES
AND THOSE SIMILARLY SITUATED

     Plaintiffs,

v.

**CLASS & COLLECTIVE ACTION**

Case No.: 6:20-cv-01625-RBD-GJK

NISSAN NORTH AMERICA, INC.,

     Defendant.

_____/

## <u>PLAINTIFF'S (CLASS/COLLECTIVE REPRESENTATIVE), JOSE AYALA, AMENDED RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES[1]</u>

     Plaintiff, JOSE J. AYALA, JR., on behalf of himself and those similarly situated, by and through undersigned counsel, pursuant to Rule 34, responds to Defendant's, NISSAN NORTH AMERICA, INC., First Set of Interrogatories as follows:

1.    Identify all persons known to you who have any knowledge of the facts alleged in your Complaint and, for each such individual, identify the substance of each individual's knowledge, last known address, and phone number.

---

[1] Plaintiff reserves the right to supplement or amend these answers to Defendant's Interrogatories as discovery is ongoing.

**ANSWER**: Please see the initial disclosures my attorneys made on my behalf, which was served on Defendant on October 18, 2021 for this information. The foregoing notwithstanding, please see the summary below:

- Kevin K. Ross-Andino, (Counsel for Plaintiffs and class/collective action members)
  307 Cranes Roost Boulevard, Altamonte Springs, FL 32701
  407-636-7004

- Jolynn M. Falto, (Co-Counsel for Plaintiffs and class/collective action members)
  307 Cranes Roost Boulevard, Altamonte Springs, FL 32701
  407-636-7004

- Nikki J. Pappas, (Co-Counsel for Plaintiffs and class/collective action members)
  307 Cranes Roost Boulevard, Altamonte Springs, FL 32701
  407-636-7004

- Jeff Santos (co-class/collective action representative Plaintiff)
  Can be contacted through counsel of record identified above.

- Any and all class and collective action members during the class period described within the First Amended Complaint.
  Can be contacted through counsel of record identified above.

- Defendant Nissan North America, Inc. and their attorneys
  Can be contacted through defense counsel of record.

- Paul Rogers
  Can be contacted through defense counsel of record.

- Barbara Park
  Can be contacted through defense counsel of record.

2.    Identify each Nissan independent dealer that directly employed you as a mechanic or technician (or in a similar automobile maintenance and repair position) from September 1, 2015 to the present and, for each such entity, state the positions you held with each entity; the dates you held each position; and your supervisor(s) or manager(s) for each position.

**ANSWER:**
Sutherlin Nissan
8125 E Colonial Dr, Orlando FL 32817
John Snoke: Service Manager
Position: Automotive Technician. Please note, I also held the official title of Team Leader.
Approximate Time: 2011 - 2019

Reed Nissan Clermont
16005 State Rd. 50, Clermont FL 34711
Bob Suranovich[2]: Service Manager
Position: Service Technician
Approximate Time: November 2019 – March 2020

3.      For each position with each entity identified in your response to Interrogatory No. 2, describe your typical day-to-day tasks, including the number or percentage of work hours you spent performing each task.

**OBJECTION:** Plaintiff objects to this interrogatory on the grounds that it is overly broad and unduly burdensome as it appears to require Plaintiff to provide a line-item-accounting of the various tasks he performed on a daily basis, including the amount of work hours spent in performing each task during the class period, stemming from 2015 to present time. This interrogatory is best suited for deposition testimony as it tends to call for a narrative from Plaintiff over an extensive amount of time (2015 through the end of his employment with Nissan). The foregoing notwithstanding, please see below.

**ANSWER:** During my time at the previously mentioned Nissan dealerships as an automotive/service technician, I generally performed the following types of tasks on a day-to-day basis:

Technician/Vehicle Service Work: encompassed approximately 80% of a typical workday on average and included (but is not limited to) the following:
   o   Diagnosing repairs to the vehicles that came to the dealerships, which included both warranty-work under Nissan vehicle warranties and "customer-paid-work".

---

[2] Correct spelling of the last name is unknown at this time.

- o Perform the work required to maintain/repair the vehicles that came into the dealership which included both warranty-work under Nissan vehicle warranties and "customer-paid-work".
- o Conduct all maintenance and repair work in accordance with Nissan's requirements.
- o Assist other technicians with certain work and diagnostics on vehicles.

<u>Administrative/Other Work</u>: encompassed approximately 20% of a typical workday on average and included (but is not limited to) the following:

- o When I was team leader at Sutherlin Nissan, I would have to assist in the distribution of work to other technicians within my "team". The work consisted of both "warranty-work" and "customer-paid-work".
- o Review of bulletins and other manuals/policies/similar associated with warranty-work vehicles and customer-paid vehicles to ensure compliance with Nissan's standards. Conduct any administrative /compliance work to make sure I followed Nissan's directions for repair/maintenance of vehicles.
- o Documenting and providing information required to Nissan on warranty-work vehicles.
- o Communicating with customers and/or service writers on vehicles and/or vehicle repairs.
- o Organizing and cleaning the shop to maintain Nissan's brand standards.
- o Organize and clean workspace(s) to maintain Nissan's brand standards and expectations.
- o Assist with other warranty-work issues to ensure compliance with Nissan's standards and to promptly deliver the vehicle to the customer in a reasonable time.

<u>Other Work (not necessarily on a daily basis, but was frequent):</u>

- o Participate in Nissan-specific training within the NNAnet.com website to ensure compliance with standards and to gain the ability to be paid on certain warranty-work.
- o Attend/participate in meetings with technician/service department to discuss any issues, frequent warranty-work recalls/repairs, status of shop, etc.
- o Discussions with persons from Nissan (TSM and DTS) regarding certain directions for warranty work and customer-paid work.

4

4.    For each identified in your response to Interrogatory No.2, describe the circumstances of your hiring with such entity, including the individual(s) to whom you submitted your application(s), the individual(s) with whom you interviewed for the job, the individual(s) who decided to hire you, and the individual(s) who communicated the decision to hire you.

**ANSWER:**

**Sutherlin Nissan**: 2011-2019
I believe I was interviewed by Dave Dalton. Hiring Manager at the time was Ray Powers. At that time, I was to be paid $20 per flat rate hour (in comparison, the flat rate amounts per task are decided by Nissan North American) when with Sutherlin Nissan. All other raises were given by John Snoke.

**Reed Nissan Clermont**: November 2019 through March 2020.
I believe I was interviewed by Bob Suranovich. I believe he submitted my hourly pay rate (in comparison, the flat rate amounts per task are decided by Nissan North American). Supervisor Keith Mantel dispatched work and communicated with me as well.

5.    For each entity identified in your response to Interrogatory No.2, describe the circumstances of the cessation of your employment with such entity, including whether you resigned or were terminated and, if you were terminated, the reason for the termination, the individual(s) who made the decision to terminate your employment, and the individual(s) who communicated the termination decision to you.

**ANSWER:** I resigned from both Sutherlin Nissan and Reed Nissan Clermont for various reasons which culminated over time, including false promises, not making sufficient hours, arbitrary and unfair deductions in pay for work I completed (especially with Nissan warranty-work), not being fairly compensated for the work I completed as a technician, and lack of work resources/tools (which I had to purchase on my own, from my own funds/resources). I did not feel that the technicians were treated and compensated fairly for all the work and hours they put in; this caused a lot of friction within the workplace and with morale.

6.    For each position with each entity identified in your response to Interrogatory No.2, identify the individual(s) who supervised or directed your day-to-day work

5

activities, including not limited to, the individual(s) who set your schedule, the individual(s) who provided you with work assignments and tasks, the individual(s) who conducted performance reviews, the individual(s) who disciplined you, and the individual(s) who determined your compensation and any changes to that compensation and, for each individual, describe such individual's supervision or direction of you day-to-day work.

> **ANSWER:** While working at Sutherlin Nissan, the Service Manager was John Snoke; however, I was not "traditionally" supervised over my day-to-day work itself by John Snoke. Work was channeled through to technicians from service writers that would administer the vehicles that came to the dealership for service; work was not generally specifically "assigned" because we would take the next vehicle ticket that was on a rack from the service writers (the service writers would essentially "intake" the cars). No one conducted performance reviews at all, to my knowledge. Disciplinary issues were rare, but I believe John Snoke was the person who would provide warnings/issue any disciplines. John Snoke assigned the hourly pay rate. Defendant Nissan North America (who we called "Corporate") would dictate how many hours/parts-of-an-hour the specific task I conducted would pay. For example, if a warranty-paid transmission was the task to be completed, the Defendant decided that it would pay four hours for that work (for example), no matter if it took me substantially longer than four hours. Therefore, my take-home pay—the hours that I "turned"—were dictated by Defendant. We are paid the flat rates set by Nissan for the work we "turned". Nissan set the requirements for how we were to be paid on flat rate amounts per job for warranty repair work. Direction for the work conducted, especially for warranty-work, was provided by Defendant through their various manuals, policies, bulletins, the NNAnet.com programs, and the Nissan Assist Program. Further, the Products Resource Manual provided a substantial amount of direction imposed on the technicians and, in part, how technicians were to be paid in their flat rate work.

> Virtually everything was identical between Sutherlin Nissan and Reed Nissan with a few changes. For example, while at Reed Nissan in Clermont, my manager was Bob Suranovich and the Shop Foreman/Supervisor was Keith Mantel. Keith Mantel dispatched the work to the technicians.

7.    Identify every tool, piece of equipment, or supply your purchased without reimbursement from September 1, 2015 to the present which you claim you were required to purchase to perform your work as a technician/mechanic and, for each

tool, piece of equipment, or supply, provide the date of the purchase and the amount you paid for it.

> **ANSWER:** On average, I likely spent above $3,000 per year on tools and work materials from Snap-on, Matco and Cornwell (and likely other brands of tools/equipment as well). I will provide the documents I have in my possession showing the tools I purchased and used during my time with Nissan, which were required for my work.

8.    Identify each communication that you had with a Nissan employee (not an employee of the independent dealer which directly employed you) from September 1, 2015 to the present, including the person(s) with whom you communicated, the date of communication, the manner of communication (e.g., verbal, letter, e-mail), and the substance of the communication.

> **ANSWER:** While I cannot remember the specific dates, I spoke with various TSM and DTS personnel from Nissan during my time as a technician. Additionally, over my several years working as a technician, I had various communications over the phone with unknown persons at Nissan regarding warranty vehicles and service issues with vehicles to receive direction.

9.    Identify each Nissan employee (not an employee of the independent dealer which directly employed you) whom you claim supervised or directed your work and, for each such individual, describe the nature and extent of his or her supervision or direction of your work.

> **ANSWER:** Various TSM and DTS personnel from Nissan during my time as a technician assisted and provided direction. Additionally, over my several years working as a technician, I had various communications over the phone with unknown persons at Nissan regarding warranty vehicles and service issues with vehicles to receive direction.

> Most importantly, Defendant Nissan controlled (via their specific manuals, policies, bulletins, and other documents) how technicians would conduct their work—we were required to perform all repairs (warranty-work especially, but also with customer-paid work to ensure consistency) according to Nissan's various manuals. Ultimately, we were required to work, act, clean, and stay organized in the manner consistent with and complying with Nissan's many policies and procedures.

10.    Describe in detail each way in which you contend you were injured or have suffered damages, including, but not limited to,

       a) stating the total amount of damages claimed and a computation of each category of damages you claim;
       b) itemizing the amount of each element of damages claimed;
       c) stating all facts or grounds upon which you rely to support each element of damages claimed;
       d) stating the methods, theories and calculations by which you arrived at the claimed dollar amounts of each element of damages claimed;
       e) identifying any person whom you know or whom you believe has knowledge of the basis for and calculation of such damages; and
       f) identifying the person(s) who calculated the amount of each element damages.

**ANSWER:** I am not a legal expert, so I defer to my attorneys and future expert(s) to describe my damages; however, I am owed various wages and other monetary compensation from Nissan for work that I performed for Nissan over the years. I was not provided a minimum wage for a portion of my damages, and I was not compensated for other work performed that is not part of the "flat rate" issue (i.e. unflagged hours). There are also hours that I should have been paid that are outside the FLSA/FMWA realm which I was just plainly not compensated for. I also understand that there are benefits that I provided Nissan that I was not compensated for, such as cleaning the shops, doing required Nissan trainings, buying and using tools to conduct the work, and keeping shops organized in compliance with Nissan's requirements. I will produce paystubs, receipts, and other documents responsive to this interrogatory to help substantiate my claims and damages. Further, I defer to the future expert(s) that will disclose expert report(s) on my behalf.

11.    Describe in detail every criminal offense (other than minor traffic citations constituting a misdemeanor) of which you been convicted, if any, during the seven-year period prior to the commencement of this lawsuit, regardless of the magnitude of the offense, and specify the dates and jurisdiction of the conviction, the offense(s) of which you were convicted, and any sentence imposed against you. Identify the time period which you were on probation or otherwise under court supervision.

**ANSWER:** None currently known.

12.     Identify all expert witnesses whom you expect to testify at trial of this matter and, for each, state the subject matter on which they are expected to testify, the facts and opinions to which they are expected to testify, and a summary of the grounds for each opinion they expect to express.

> **ANSWER:** As discovery remains underway, my attorneys have not finished evaluating what expert(s) would be presented for this case; however, I understand we will disclose expert(s) report(s) by the Court's deadline of February 14, 2022.

**VERIFICATION PAGE**

I have read the foregoing Answers to Interrogatories and do swear that they are true and correct of the best of my knowledge and belief.

_Jose Ayala_
Signature

_José Ayala_
Printed Name

STATE OF Florida
COUNTY OF Seminole

Sworn to or affirmed and signed before me on November, 30th, 2021, by JOSE J. AYALA.

_[signature]_
NOTARY PUBLIC or DEPUTY CLERK

_Drew Matthew Fulmer_
[Print, type or stamp commission name of notary of deputy clerk]

___ Personally Known
_X_ Produced Identification
Type of Identification produced: Florida DL

DREW MATTHEW FULMER
Notary Public · State of Florida
Commission # GG 351825
My Comm. Expires Jul 4, 2023
Bonded through National Notary Assn.